**IN THE COMMON PLEAS COURT OF CLERMONT COUNTY, OHIO**
**CIVIL DIVISION**

**TOTAL QUALITY LOGISTICS, LLC,**
4289 Ivy Pointe Boulevard
Cincinnati, Ohio 45245

        **Plaintiff,**

      **v.**

**JACK KIMBALL,**
9104 Creek Glen Way
Apex, NC 27502

**SOUTHERN AG CARRIERS, INC.,**
3422 Sylvester Road
Albany, GA 31705

SERVE ALSO:
c/o Hugh Nall, Statutory Agent
359 Lovers Lane
Leesburg, GA 31763

       and

**SENTRY LOGISTICS GROUP, INC.**
3422 Sylvester Road
Albany, GA 31705-6403

SERVE ALSO:
c/o Hugh Nall, Statutory Agent
359 Lovers Lane
Leesburg, GA 31763

        **Defendants.**

Case No. 2023CVC0090

JUDGE **JUDGE MILES**

**VERIFIED COMPLAINT**
**FOR DAMAGES AND**
**INJUNCTIVE RELIEF**

1

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

For its Verified Complaint for Money Damages, Temporary, Preliminary, and Permanent Injunction, and Other Relief against Defendants Jack Kimball ("Kimball"), Sentry Logistics Group, Inc. ("Sentry"), and Southern Ag Carriers, Inc. ("Southern Ag") (collectively, "Defendants"), Plaintiff Total Quality Logistics, LLC ("TQL") states as follows:

## INTRODUCTION

1. This case arises from a breach of Defendant Kimball's "Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement" (the "Kimball Agreement") with TQL; Defendants' tortious interference with TQL's contract/business relationships; and Defendants' misappropriation of confidential and trade secret information of TQL.

## PARTIES, JURISDICTION, AND VENUE

2. TQL is an Ohio limited liability company with its principal place of business located in Clermont County, Ohio. TQL provides freight brokerage and third-party logistics services to Customers across the continental United States.

3. Kimball is a North Carolina resident. Upon information and belief, he resides at 9104 Creek Glen Way Apex, NC 27502. Kimball previously worked as an employee of TQL in its Raleigh, North Carolina office until May 19, 2023.

4. Southern Ag is incorporated in Georgia with its principal place of business in Albany, Georgia. Southern Ag is a direct competitor of TQL, in that Southern Ag holds itself out as a "full-encompassing asset based logistics solution" providing, among other things, supply chain management, regional truckload solutions, nationwide logistics, refrigerated transport services, and agriculture logistics solutions.

2

5.      Sentry is incorporated in Georgia with its principal place of business in Albany, Georgia, although Sentry also does business in North Carolina. Sentry is a direct competitor of TQL, as Sentry holds itself out as a third-party logistics company that provides, among other things, customized truckload freight brokerage services throughout the United States. Sentry also now holds itself out as a division of Southern Ag.

6.      Jurisdiction and venue are appropriate because the Kimball Agreement governing TQL's employment relationship with Kimball originated from Clermont County, Ohio; the Kimball Agreement provides for Clermont County as the proper venue for disputes; all improper acts and conduct were purposely directed toward TQL's systems and headquarters located at its Clermont County, Ohio headquarters; the Confidential Information at issue in this lawsuit is housed in Clermont County, Ohio; and all or part of TQL's claims for relief arose in Clermont County, Ohio.

### FACTS COMMON TO ALL COUNTS

7.      TQL is a national leader in the third-party logistics industry, providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and assistance with supply-chain management across the continental United States.

8.      TQL's Customers consist of companies that want to arrange shipment of goods from one location to another. These Customers include companies that need to ship their own goods; however, many of TQL's Customers also include other freight brokers that have already agreed to ship goods on behalf of another Customer, but need assistance in finding a Motor Carrier to fulfill the shipment.

3

9.    TQL does not own or operate any of its own trucks. Nor does TQL employ any drivers to haul freight. Rather, TQL engages and coordinates independent carriers that are able and willing to haul freight at the times and places required by TQL's Customers.

10.    The third-party logistics industry (and the freight-shipping industry at large) is extremely competitive. Relationships with Customers, Motor Carriers, and other brokers are critical to success. It is very common in the brokerage industry for companies to have confidentiality, non-compete, and non-solicitation agreements with their employees and contractors.

11.    Among other things, TQL's relationship with Customers and Motor Carriers is essential to sustained success within the industry. TQL spends a great deal of time, money, and other resources developing relationships with new Customers and strengthening relationships with existing ones.

12.    Further, TQL has made substantial investments to develop and protect the secrecy of its proprietary systems, processes, and procedures that it uses to manage operations and to compete in the hyper-competitive industry. The Kimball Agreement defines "Confidential Information" of TQL to include, but not limited to, the following:

> * * * its operating policies and procedures; computer databases; computer software; methods of computer software development and utilization; computer source codes; non-employee related financial records, including but not limited to, credit history and information about Customers and potential Customers, Motor Carriers, and suppliers; information about transactions, pricing, the manner and mode of doing business, and the terms of business dealings and relationships with Customers and Motor Carriers; financial and operating controls and procedures; non-employee related contracts and agreements of all kinds, including those with Customers, Motor Carriers, and vendors; pricing, marketing, and sales lists and strategies; Customer lists and Motor Carrier lists including contact names, physical and email addresses, telephone numbers, and other information about them; trade secrets; correspondence; accounts; business policies; purchasing information; functions and records; logistics management; and data, processes, and procedures. Confidential Information also includes any information described above which

4

TQL obtains from another company, whether or not the information is owned or developed by TQL and which TQL treats as proprietary or designates as Confidential Information, whether or not owned or developed by TQL. * * * *

13.     In addition, TQL maintains and closely protects its trade secrets and other confidential and proprietary information by conditioning employee access upon the use of constantly changing passwords. Likewise, TQL's systems implement internal controls preventing employees from downloading or printing certain information, as well as restrictions on sending confidential information outside TQL's secured network.

14.     To further protect its trade secrets, Customer relationships, and all other confidential and proprietary information, all freight brokers, as well as many other types of employees, before beginning employment at TQL, must sign restrictive covenants limiting their ability to unfairly compete with TQL, soliciting TQL's Customers or employees, or disclosing or misusing TQL's trade secrets and confidential and proprietary information.

15.     Kimball worked for TQL from July 12, 2021 until May 19, 2023.

16.     Kimball came to TQL with no prior experience in the third-party logistics industry or the freight-shipping industry at large. Therefore, TQL provided Kimball with extensive training on matters including, among other things, its services, pricing structure, sales strategies, and techniques, Customers, and general operations. TQL's unique logistics training program is intensive and generally lasts between eight (8) to twenty-six (26) weeks, and Kimball received training for the full twenty-six (26) weeks.

17.     Kimball began his employment at TQL as a Logistics Account Executive Trainee and successfully completed TQL's comprehensive and unique training program. After many weeks of intense training, Kimball was subsequently promoted from a Logistics Account Executive Trainee to a Logistics Account Executive on January 10, 2022. Kimball then moved on

5

to become a Logistics Coordinator I on February 21, 2022, and then promoted to a Logistics Coordinator II on March 27, 2023.

18.    Kimball was successful as a TQL broker, especially as to the Customers he serviced consistently.

19.    Throughout his employment with TQL, Kimball acquired detailed knowledge of TQL's unique operations, including, without limitation: shipping, third-party logistics, freight and truck brokerage, and supply-chain management services. Kimball also had access to TQL's confidential, highly-proprietary, and/or trade secret information in performing his job duties, including: access to its proprietary software, operating policies and procedures, financial records (such as credit history and other similar information about current and prospective Customers, suppliers, and Motor Carriers), information about pricing and the manner and mode of doing business, the current and historical terms of TQL's business dealings and relationships with Customers and Motor Carriers, proprietary logistics and sales training materials, contracts and agreements of all kinds, sales lists and strategies, and detailed Customer and Motor Carrier lists and information.

20.    Kimball was also required to manage existing and potential business relationship with TQL's Customers and prospective Customers. Kimball developed close relationships with, and has an intimate knowledge of business practices of TQL Customers and the Motor Carriers that TQL contracted with to transport TQL Customers' freight.

21.    On July 12, 2021, Kimball and TQL executed the Kimball Agreement, a true and accurate copy of which is attached as Exhibit A.

22.    In this Agreement, Kimball agreed, among other things, that during the course of his employment with TQL and for a period of one (1) year after employment with TQL ended, not

6

to: (a) directly or indirectly, own, operate, maintain, consult with, be employed by, engage in, or

have any other interest in any business or entity that competes with TQL: (b) directly or indirectly

solicit any TQL Customer or Motor Carrier, or take any action to divert work from TQL; or (c)

directly or indirectly interfere or tamper with, disrupt or attempt to disrupt any contractual or

business relationship TQL has with any Customers or Motor Carriers.

23.     The Kimball Agreement further states, in relevant part, as follows:

**WHEREAS,** TQL is an Ohio limited liability company providing shipping
services, third-party logistics services, freight brokerage services, truck brokerage
services, and supply-chain management services throughout the Continental United
States. * * *

* * *

**5. Confidential Information Is for TQL's Use Only.** Unless Employee has prior
written consent from TQL, Employee shall not at any time during the course of his
or her employment by TQL, and at all times thereafter, use for any purpose or
publish, copy, disclose, or communicate to any individual, firm, corporation, or
other business entity other than TQL, any Confidential Information, except as
properly necessary and authorized by TQL in the conduct of TQL's business or as
required by law. Employee agrees that all information related to TQL's business
and disclosed to Employee or to which Employee has access during the period of
his or her employment shall be presumed to be Confidential Information hereunder
if there is any reasonable basis to believe it to be Confidential Information or if
TQL appears to treat it as confidential.

* * *

**7. Presumption Regarding Confidential Information.** Employee agrees that,
during the time limits of the covenants identified in Section 9(b), Employees
engaging in any form of employment relationship with a Competing Business, as
defined in Section 9 below, will be presumed to necessarily result in Employee
revealing, basing judgments and decisions upon, or otherwise using TQL's
Confidential Information to unfairly compete with TQL.

* * *

**9(b). Covenants.** Employee agrees that, during the course of his or her
employment (except as required in the course of Employee's employment with
TQL), and for a period of one (1) year after termination or cessation of Employee's
employment for any reason:

(i)     Employee will not, directly or indirectly, own, operate, maintain,
consult with, be employed by (including self-employment), engage in, or have any

7

other interest (whether as an owner, shareholder, officer, director, partner, member, employee, joint venture, beneficiary, independent contractor, agent, or any other interest) in any Competing Business (as defined below), except the ownership of less than 1% of the outstanding equity securities of any publicly-held corporation or entity;

(ii)     Employee will not directly or indirectly, either as an employee, agent, consultant, contractor, officer, owner, or in any other capacity or manner whatsoever, whether or not for compensation, participate in any Competing Business (as defined below);

(iii)    Employee will not, directly or indirectly, solicit any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action, to divert business from TQL;

(iv)    Employee will not, directly or indirectly, interfere with, tamper with, disrupt, use, or attempt to disrupt any contractual or other relationship, or prospective relationship, between TQL and any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL; and

(v)     Employee will not, directly or indirectly employ, recruit, solicit, or assist others in employing, recruiting, or soliciting any person who is, or within the twelve (12) months prior to the termination of Employee's employment has been, an employee of, consultant with, or been party to another business relationship with TQL.

(vi)    It is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

(c) **Trade Secrets.** The Employee recognizes and acknowledges that TQL's trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information as they may exist from time to time are valuable, special, and unique assets of TQL's business, access to and knowledge of which are essential to performance of Employee's duties hereunder. Employee will not at any time hereafter disclose such trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever, except as required by law, nor shall Employee make use of any such property for Employee's own purpose or the benefit of any person, firm, corporation, association, or any entity other than TQL under any circumstance. Employee recognizes and acknowledges that TQL has a near permanent relationship with its Customers and but for Employee's association with TQL, Employee would not have such contact with Customers. Employee agrees and understands that information regarding the terms and conditions of Employee's employment or the employment of other TQL employees is not considered

8

Confidential Information and that this Agreement is not intended to discourage concerted activity regarding the terms and conditions of employment.

(d) **Reasonableness of Restrictions.** Employee recognizes that the foregoing geographic, duration, and content restrictions are reasonable and properly required for the adequate protection of the business of TQL from the disclosure of Confidential Information and unfair competition. Employee recognizes the geographic scope applicable to this Agreement - the continental United States - is reasonable based on the understanding of the parties that TQL operates throughout the continental United States as of the date of this Agreement, and Employee will represent TQL's interests with Customers and potential customers throughout the continental United States on a regular basis.

(e) **Injunction.** If there is a breach or threatened breach of any part of this Agreement, TQL shall be entitled to an injunction restraining Employee from such breach or threatened breach. Alternatively and additionally, TQL, in its sole discretion, may pursue a claim for damages in tort and/or contract resulting from any breach or threatened breach of this Agreement by Employee. If Employee is found by a court of competent jurisdiction to have violated the terms of this Agreement, Employee shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL.

(f) For purposes of this Agreement, the term: (i) "Customer" is any individual, business, or other entity, for whom TQL has rendered any service, or with respect to which TQL has planned and/or made contact for the purpose of rendering any service, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (ii) "Motor Carrier" is any over-the-road shipper, carrier, trucker, or hauling business that has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (iii) "Competing Business" is any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States; and (iv) "solicit" includes, but is not limited to, any efforts in any form intended to take business away from, intercept, or interfere with the business of TQL, including relationships with TQL and its employees, Customers, Motor Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any Customer or Motor Carrier.

* * * *

24.     When he joined TQL, Kimball acknowledged and agreed that TQL's "Confidential Information," whether or not formally designated as such, was vital to the success of TQL's

business and that any unauthorized use or disclosure of TQL's Confidential Information would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL.

25.     Kimball also agreed that TQL's Confidential Information is a proprietary trade secret with significant economic value, compiled through a substantial investment of time and money by TQL, and are not common knowledge throughout the Industry.

26.     Kimball promised that he would at all times refrain from using, sharing, or disclosing TQL's Confidential Information to any individual or business entity (except as authorized by TQL in the conduct of TQL's business or as required by law).

27.     Kimball acknowledged that association with a business competitive with TQL would inevitably result in him revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

28.     Kimball further agreed that the running of the one (1) year non-competition restriction shall be tolled during any time period during which Employee violates any provision of this Agreement.

29.     TQL's trade secrets, Customer lists, and other Confidential Information are valuable, special, and unique assets of TQL's business that Kimball agreed to not disclose to anyone for any reason, except as required by law. Kimball further agreed that he would not make use of TQL Confidential Information for anyone other than TQL.

30.     The Kimball Agreement also bans the use and disclosure of TQL's Confidential Information, such as information related to Customers, for the benefit of any person or entity other than TQL.

10

31.     Kimball agreed that the content, time, and geographic restrictions placed on him by the Kimball Agreement were reasonable and required for protection of TQL's business and that a breach or threatened breach of any part of the Kimball Agreement, would entitle TQL to an injunction.

32.     In consideration of the Kimball Agreement set forth above, TQL hired him. TQL would not have provided Kimball with 26 weeks of training, allowed Kimball to gain knowledge of TQL's proprietary Customer information, or access any of TQL Customer and prospective Customer relationships had it not executed the Kimball Agreement.

33.     Kimball voluntarily resigned his employment with TQL on May 19, 2023 for another job opportunity.

34.     Thereafter, TQL reminded Kimball of the obligations contained in his Agreement by way of electronic mail.

35.     During the week of June 1, 2023, TQL learned for the first time that Kimball has been unfairly competing against TQL by working for Sentry and Southern Ag.

36.     As a shipping and supply-chain management services company, Southern Ag is a "Competing Business" as that term is defined in the Kimball Agreement. Accordingly, per the express terms of the Kimball Agreement, Kimball is prohibited from working for Southern Ag.

37.     As a third-party logistics company, Sentry also is a "Competing Business" as that term is defined in the Kimball Agreement. Accordingly, per the express terms of the Kimball Agreement, Kimball also is prohibited from working for Sentry.

38.     Sentry, a subsidiary of Southern Ag, has active brokerage authority through the U.S. Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA") under MC # 00708332 and DOT # 2246410.

11

39.     Upon information and belief, Kimball has been working for Sentry and Southern Ag in the same or similar position as he held with TQL, within one month of his employment with TQL ending. Given that he has assumed a similar, if not the same, role that he had while working with TQL, it is inevitable that he will use Confidential Information of TQL to unfairly compete with TQL, in violation of the Kimball Agreement.

## COUNT ONE – BREACH OF CONTRACT
### (Against Defendant Kimball)

40.     TQL incorporates Paragraphs 1 to 39 of this Verified Complaint as if fully restated here.

41.     TQL and Kimball entered into the Kimball Agreement on July 12, 2021, freely and without duress.

42.     The Kimball Agreement constitutes a valid and legally enforceable contract.

43.     In exchange for Kimball's commitment to be bound by the Kimball Agreement, TQL provided Kimball with adequate and sufficient consideration, including, without limitation, ongoing employment, compensation, extensive training, and continued access to TQL's Confidential Information to assist with his professional development.

44.     TQL fully performed all of its obligations under the Kimball Agreement.

45.     Kimball has breached the Kimball Agreement by, among other things, failing to abide by the confidentiality obligations, as discussed above, working for a Competing Business, misappropriating TQL's trade secrets, and, inevitably likely will solicit TQL's Customers and Motor Carriers, as those terms are defined in the Kimball Agreement.

46.     As a direct and proximate cause of Kimball's breach of the Kimball Agreement, described above, TQL has suffered monetary damages in an amount to be proven at trial, exceeding $25,000.

12

47.     Monetary damages alone will be insufficient to remedy all of the harm caused to TQL by Kimball's breach of the Kimball Agreement. As a direct and proximate result of Kimball's actual or threatened unlawful conduct, TQL has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law.

48.     Kimball agreed that the content, time, and geographic restrictions placed on him by the Kimball Agreement were reasonable and required for the protection of TQL's business, and that a breach of threatened breach of any part of the Kimball Agreement entitled TQL to an injunction.

49.     TQL is entitled to a temporary restraining order and a permanent injunction to prevent any such further unlawful conduct.

50.     Pursuant to the Kimball Agreement, TQL is also entitled independently to recover the attorneys' fees and costs expended as a result of Kimball's conduct, in an amount to be proven at trial and/or through appropriate post-trial motions.

51.     Wherefore, TQL requests a temporary restraining order, preliminary injunction, and a permanent injunction prohibiting Kimball from further breaches of the Kimball Agreement, with restrictive covenants extended as the result of the agreed tolling provision triggered by Kimball's breach. TQL further requests recovery of its attorneys' fees and compensatory damages in a sum to be proven at trial. Upon information and belief, TQL's damages exceed $25,000.

## COUNT TWO – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Defendants Sentry and Southern Ag)

52.     TQL incorporates Paragraphs 1-51 of this Verified Complaint as if full restated here.

53.     TQL's Agreement with Kimball is a valid and binding contract.

54. Sentry and Southern Ag knew or should have known of the Kimball Agreement when considering whether to hire him, and TQL made them aware of the Kimball Agreement before filing this lawsuit.

55. Sentry and Southern Ag are allowing Kimball to continue working for them despite knowing that he is subject to the valid and enforceable restricts in the Kimball Agreement.

56. Sentry and Southern Ag are purposefully and intentionally interfering with the Kimball Agreement.

57. Sentry and Southern Ag have ignored the contractual obligations that Kimball owes to TQL, without any justifiable excuse and in bad faith.

58. As a direct and proximate result of Sentry and Southern Ag's conduct, TQL has been damaged by, among other things, the loss of sales revenue, Customer relationships and goodwill, and fair competition; TQL has suffered monetary damages in an amount to be proven at trial, exceeding $25,000.

59. Monetary damages alone will be insufficient to remedy all of the harm caused to TQL by Sentry and Southern Ag's tortious interference with the Kimball Agreement. As a direct and proximate result of Sentry and Southern Ag's unlawful conduct, TQL has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

60. TQL is entitled to a temporary restraining order and permanent injunction to prevent any such further unlawful conduct.

61. Wherefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Sentry and Southern Ag from tortiously interfering with the Kimball Agreement. TQL further requests recovery of attorneys' fees, compensatory damages, and punitive damages as permitted by law.

14

62. Because the conduct of Sentry and Southern Ag has been intentional, willful, and malicious, TQL is additionally entitled to an award of punitive damages.

## COUNT THREE – TORTIOUS INTERFERENCE WITH CONTRACT/BUSINESS RELATIONS
### (Against All Defendants)

63. TQL incorporates Paragraphs 1 to 62 of this Verified Complaint as if fully restated here.

64. TQL has contractual and/or business relationships with its Customers and Motor Carriers, of which Defendants have had knowledge at all relevant times.

65. Despite this knowledge, Defendants have knowingly and intentionally interfered with these contractual and/or business relationships, and will likely continue to do so, by inevitably soliciting Customers and Motor Carriers for their own benefit.

66. Defendants have acted tortiously, willfully, and maliciously, without any justifiable excuse, and in bad faith.

67. As a direct and proximate cause of Defendants' conduct, TQL has been damaged by, among other things, the loss of sales revenue, Customer relationships and goodwill, and fair competition; TQL has suffered monetary damages in an amount to be proven at trial, exceeding $25,000.

68. Monetary damages alone will be insufficient to remedy all of the harm caused to TQL by Defendants' tortious interference. As a direct and proximate result of Defendants' actual or threatened unlawful conduct, TQL has suffered, and will continue to suffer, irreparable harm for which there is no adequate remedy at law.

69. TQL is entitled to a temporary restraining order and permanent injunction to prevent any such further unlawful conduct.

70.     Wherefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from tortiously interfering with TQL's Customer relationships, with restrictive covenants extended as the result of the agreed tolling provision triggered by Kimball's breach. TQL further requests recovery of attorneys' fees, compensatory damages, and punitive damages as permitted by law.

71.     Because of the conduct of Defendants has been intentional, willful, and malicious, TQL is additionally entitled to an award of punitive damages.

## COUNT FOUR – MISAPPROPRIATION OF TRADE SECRETS UNDER OHIO LAW
### (Against All Defendants)

72.     TQL incorporates Paragraphs 1 to 71 of this Verified Complaint as if fully restated here.

73.     TQL has trade secrets and develops and maintains confidential and highly proprietary information, including, among other items, software systems and other proprietary technology, information about its business dealings and relationships with its Customers, Customer lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with Customers and vendors), marketing, and sales lists and strategies.

74.     TQL's confidential information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, including TQL's competitors. And this information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy including conditioning employee access of its system upon use of constantly changing passwords, restricting employees from downloading or printing certain

16

information, and requiring a employees to agree to sign an agreement containing confidentiality and restrictive covenant provisions similar to those included in the Kimball Agreement.

75. TQL has spent much time over many years and invested significant sums, in terms of both financial and human resources, to develop and maintain this information.

76. TQL's confidential information is protected, in whole or in part, as a trade secret under the Ohio Uniform Trade Secrets Act, R.C. 1333.61, *et seq*.

77. Kimball's misconduct and wrongful taking of Confidential Information constitutes misappropriate under the Ohio Uniform Trade Secrets Act, because Kimball has used, is threatening to use, and/or inevitably will use the Confidential Information for himself and/or Defendants Southern Ag and Sentry to unfairly compete with TQL.

78. At the time Kimball misappropriated TQL's trade secrets, he knew he acquired those trade secrets by improper means, and had clear knowledge that he only had access to the protected information under circumstances giving rise to a duty to maintain the information's secrecy.

79. On information and belief, the Defendants have willfully misappropriated or threatened to misappropriate TQL's trade secrets including, among other things, TQL proprietary technology, TQL Customer and Motor Carrier identities, Customers and Motor Carrier lists, and other Customer and Motor Carrier information for use against TQL and for the benefit of the Defendants, within the meaning of the Ohio Uniform Trade Secrets Act.

80. As a direct and proximate result of Defendants' conduct, TQL has been damaged by, among other things, the loss of sales revenue, Customer relationships and goodwill, and fair competition; TQL has suffered monetary damages in an amount to be proven at trial, exceeding, $25,000.

81.     Monetary damages alone will be insufficient to remedy all of the harm caused to TQL by Defendants' violation of Ohio law. As a direct and proximate result of the Defendants' actual or threatened misappropriation of TQL's trade secrets, TQL has suffered, and will continue to suffer, immediate, substantial, and irreparable harm for which there is no adequate remedy at law.

82.     Wherefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants' further use and misappropriation of TQL's trade secrets, with restrictive covenants extended as the result of the agreed tolling provision triggered by Kimball's breach. TQL further requests recovery of attorneys' fees, compensatory damages, and punitive damages as permitted by law.

83.     Because the conduct of Defendants has been intentional, willful, and malicious, TQL is additionally entitled to an award of punitive damages.

**COUNT FIVE – REPLEVIN**
**(Against All Defendants)**

84.     TQL incorporates Paragraphs 1 to 83 of this Verified Complaint as if fully restated here.

85.     TQL develops and is owner of confidential, proprietary, and/or trade secret information including, among other items, software systems and other proprietary technology, information about its business dealings and relationships with its Customers, Customer lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with Customers and vendors), marketing, and sales lists and strategies.

86.     TQL has the right to immediate possession of the above referenced information because TQL is the rightful owner of that information.

87.    Upon information and belief Defendants are wrongfully retaining some or all of the above referenced information and refusing to return it to TQL.

88.    Accordingly, TQL is entitled to the immediate return of any of the above referenced information that is in either Defendants' possession, custody, or control as well as any monetary damages caused by Defendants' wrongful withholding of the same.

### COUNT SIX – CONVERSION
### (Against All Defendants)

89.    TQL incorporates Paragraphs 1 to 88 of this Verified Complaint as if fully restated here.

90.    TQL developed and is the owner of confidential, proprietary, and/or trade secret information including, among other things, software systems and other proprietary technology, information about its business dealings and relationships with its Customers, Customer lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with Customers and vendors), marketing, and sales lists and strategies.

91.    TQL has the right to immediate possession of the above referenced information because TQL is the rightful owner of that information.

92.    Upon information and belief Defendants have wrongfully deprived TQL of possession of the above referenced information by taking possession of it, using it, and refusing to return it to TQL.

93.    As a direct and proximate cause of Defendants' conduct, described above, TQL has suffered monetary damages in an amount to be proven at trial, believed to exceed $25,000.

## PRAYER FOR RELIEF

**WHEREFORE,** TQL respectfully requests that this Court issue judgment as follows:

a. On Count One, as against Kimball, grant money damages in an amount to be determined at trial as further described above, as well as a temporary restraining order and preliminary and permanent injunctive relief, along with other relief, such as attorneys' fees, as provided in the Kimball Agreement, and additional relief to be addressed in forthcoming motions;

b. On Count Two, as against Sentry and Southern Ag, grant money damages in an amount to be determined at trial as further described above, as well as a temporary restraining order and preliminary and permanent injunctive relief, and award attorneys' fees, compensatory damages, and punitive damages as permitted by law;

c. On Count Three, as against all Defendants, grant money damages in an amount to be determined at trial as further described above, as well as temporary restraining order and preliminary and permanent injunctive relief, and award attorneys' fees, compensatory damages, and punitive damages as permitted by law;

d. On Count Four, as against all Defendants, grant money damages in an amount to be determined at trial as further described above, as well as a temporary restraining order and preliminary and permanent injunctive relief, and award attorneys' fees, compensatory damages, and punitive damages as permitted by law;

e. On Count Five, as against all Defendants, award specific performance by directing Defendants to immediately return to TQL any confidential or proprietary information of TQL, including but not limited to, software systems and other proprietary technology, information about its business dealings and relationships with its

Customers, Customer lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with Customers and vendors), marketing, and sales lists and strategies.

f. On Count Six, as against all Defendants, award monetary damages in an amount to be determined at trial as further described above;

g. Order Defendants to pay court costs, prejudgment interest, and post judgment interest; and

h. Any such other or further relief that this Court deems just and proper or that justice require.

Respectfully submitted,

DINSMORE & SHOHL LLP
*/s/ Matthew J. Bakota*
Matthew J. Bakota (0079830)
Courtney N. Strickland (0102362)
1 South Main Street, Suite 1300
Dayton, Ohio 45402
Phone: (937) 449-6400
Fax: (937) 449-2836
matthew.bakota@dinsmore.com
courtney.strickland@dinsmore.com

Michael B. Mattingly (0089847)
255 E 5th St, Suite 1900
Cincinnati, Ohio 45202
Phone: (513) 977-8200
Fax:    (513) 977-8141
michael.mattingly@dinsmore.com

*Attorneys for Plaintiff, Total Quality Logistics, LLC*

21

**VERIFICATION**

STATE OF OHIO )

) ss:

COUNTY OF CLERMONT )

I, _MARC K FESTWICK_ being duly cautioned and sworn, state that I am authorized to act as an agent of Plaintiff for the purpose of verifying the Complaint herein, in accordance with the Ohio Rules of Civil Procedure. To the extent I have personal knowledge of the matters alleged in the Complaint, the information is true and accurate to the best of my knowledge and belief. As to any matters for which I do not have personal knowledge, I am authorized by Plaintiff to state that Plaintiff is informed and believes that the allegations of the Complaint are true and accurate to the best of its knowledge and belief.

_Marc K Festwick_

_MARC K FESTWICK_
(Printed name)

**NOTARY PUBLIC**

Subscribed and sworn by _Marc Bostwick_ before me, a Notary Public, on this _11th_ day of _July_ 2023.

Notary Public

KELLY A. PIERRO
Notary Public, State of Ohio
My Commission Expires
July 22, 2023

22

**TO THE CLERK:**

Please serve the Defendants by certified mail, return receipt requested. Thank you.